## WRIGHT *et al. v.* MARTIN.

1. Where on the trial of an equity case a number of questions are submitted to the jury, and the jury are instructed that if certain designated questions are answered in the negative the other questions should not be answered, and where the jury answer the designated questions in the negative, and such answers are without evidence to support them, a new trial must be ordered, unless the decree rendered is demanded by the evidence upon other issues covered by the questions to which the jury did not make answer.

2. The answers to specified questions in this case were contrary to the evidence and without evidence to support them, and the decree rendered was not demanded by the evidence upon any of the other issues made in the case.

No. 1480. FEBRUARY 12, 1920.

Complaint; equitable intervention. Before G. E. Maddox, judge pro hac vice. Walker superior court. May 3, 1919.

On November 14, 1913, Robert Martin agreed to sell to Paul D. Wright, for the sum of $1900, a certain tract of land in the eighth district and fourth section of Walker county, to wit, lot No. 245, except four acres in the southeast corner thereof. The contract, which was in writing, contained no other exception or reservation. On December 10, 1913, Wright, who had paid $700 of the purchase-money, executed and delivered to Martin, in compliance with the contract, his two promissory notes for the principal sum of $600 each, due respectively one and two years from date, and received from Martin a bond for title, in the usual form, by which Martin bound himself to execute and deliver to Wright, or his assigns, a "good and sufficient title to the property" as described above, upon the payment of the purchase-money evidenced by the notes. Wright transferred the bond for title to the Wright Mineral Springs Company, a corporation, in which he was one of the principal stockholders, agreeing in the assignment to pay the purchase-money notes. Wright failed to pay the purchase-money notes, and Martin brought suit thereon in Walker superior court. Martin resided outside of the State, and had no property in the State except his interest or equity in the land. Wright answered the suit, recited the assignment of the bond to the Wright Mineral Springs Company, and prayed that the assignee be allowed to intervene. He also pleaded, by way of equitable set-off and recoupment, the following: In 1887 Martin by deed conveyed to H. P. Lumpkin, his heirs and assigns, "all the coal, iron ore and the ores of any and all other metals, and all clays and all the mineral of every kind, except building stone and timbers, that now are or may hereafter be found on the following lands, viz.: Nos. 245 in the 8th district, 4th section of said county, together with the right and privilege of entering upon said lands and mining and transporting therefrom the coal, ores, clays, and minerals aforesaid, and taking therefrom (provided the timber and cultivatable lands thereon are not injured, used, or

molested), and also the right of ingress and egress to and from all parts of the said lands for the purpose of raising, mining, collecting, moving, and transporting therefrom each and every of the articles aforesaid and all the water that may be required for mining purposes." The deed was duly recorded in 1888. In 1901 Martin granted to the American Telephone and Telegraph Company, its successors and assigns, the right to construct, operate, and maintain its lines over the land described in the bond for title, to place necessary poles and fixtures along the roads, streets, and highways adjoining the property, to trim the trees along the lines, to set necessary guy and brace poles, attach the guy wires to trees, and to cut down all trees that might interfere with its lines, provided the company should pay all damages to valuable timber and growing crops, and that none of its lines should run over enclosed lands. The defendant had no notice of the conveyance to Lumpkin, or of the grant to the telephone company. The defendant purchased the land for the purpose of obtaining the minerals therein. The plaintiff could not convey the land according to the terms of his bond. The land was less valuable by $2500 by reason of the sale of the minerals and mineral rights therein and by reason of the grant of the easement to the telephone conpany. The defendant prayed that he be relieved of the payment of the balance of the purchase-money, and that he have judgment for any excess of damages over and above the amount of the purchase-money notes. The Wright Mineral Springs Company was allowed to intervene and become a party defendant. It averred that it was an innocent assignee, for value, of the bond for title; that at the time of the assignment of the bond it had no notice of the outstanding deed to the mineral interest in the land or of the grant to the telephone company; that it purchased the land primarily for the mineral rights therein and for the purpose of subdividing and selling the same; and that the easement granted to the telephone company prevented the subdivision and sale of that portion of the land along the roads and highways, and especially of that portion lying next to the mineral springs property, which it had also purchased from the obligee in the bond. By amendment to his petition the plaintiff admitted that he had sold the mineral interest in the land, and that he had granted an easement to the telephone company, as above set out; but he averred that the mineral in-

terest and the easement were of no value; that Wright had actual knowledge of the deed and of the grant to the telephone company at the time of his purchase; that the plaintiff intended to except both the mineral interest and the easement granted to the telephone company from his bond for title, but by mutual mistake these exceptions and reservations were left out of the contract and bond. He denied that the mineral springs company was an innocent assignee for value. He accordingly prayed for the reformation of the contract and bond, and renewed his prayer for judgment on the notes. The court submitted to the jury a series of ten questions covering the substantial issues made by the pleadings and evidence in the case. The first and third questions submitted were as follows: "1st. Was the property described in the bond for title less valuable on December 10, 1915, by reason of the previous conveyance of the mineral interest to H. P. Lumpkin than it would have been if the mineral interest had not previously been sold?" "3rd. Was the property less valuable on December 10th, 1915, by reason of such previous sale of a right-of-way to the telephone company?" The court instructed the jury that if they should answer these two questions in the negative, they should go no further in their investigation, and should not answer the remaining questions submitted. The jury answered the first and third questions in the negative, and did not answer any of the other questions. Upon questions one and three and the answers thereto, the court rendered a decree in favor of the plaintiff and against Wright for the amount of the two notes, principal, interest, and attorney's fees; and decreed that upon the payment of the judgment the plaintiff execute and deliver to Wright, or his assigns, a good and sufficient title to the lot of land described in the bond for title, with the exception of the four acres in the southeast corner thereof, the mineral rights theretofore conveyed by the plaintiff to H. P. Lumpkin, and the easement theretofore granted by the plaintiff to the telephone company. The defendants excepted to the decree, and to the refusal of a new trial.

*Henry & Jackson, Glenn & Napier,* and *Rosser & Shaw* for plaintiffs in error.

*Shattuck & Shattuck* and *F. W. Copeland,* contra.

GEORGE, J. (After stating the foregoing facts.) In the view we take of this case, the answers made by the jury are contrary to

the evidence and without evidence to support them. A witness for the defendants, Ditt Watts, testified that he and Wright made an agreement to mine the iron ore, prior to the purchase of the land from Martin; that he had had twenty or thirty years experience in the mining business, and was familiar with the ore formations in Walker county; that he had examined the land in question and had estimated the value of the minerals therein, especially the iron ore; that about two thirds of the lot contained iron ore; that the ore would run between forty and forty-five per cent.; and that the minerals on the lot were worth between three and four thousand dollars. R. M. W. Glenn was examined as a witness for the defendants, and he testified that iron ore was to be found on fifty to sixty acres of the land in question; that some of the ore could be profitably mined; and that on December 10, 1915, the land with the mineral rights was worth five or six thousand dollars, and without the mineral rights the land was worth four or five hundred dollars. Another witness, J. H. Hill, substantially corroborated the evidence of Watts and Glenn. It is true that Glenn testified that he was not an expert miner; and it is also true that Hill testified that as a miner he would not purchase the mineral interest in the lot upon condition that the timber and cultivatable lands were not to be injured, used, or molested. As the witness himself expressed it, "It would not be as valuable to me. I would not take it. As a miner, I would not take a sale of land that way. With that clause in it, as a miner I would not take it." The evidence for the defendant in detail gave the location of the lot of land in question; showed its distance from the railroad, the value of iron ore at the mine, its value on board the cars, and the cost of mining and loading the same. The only evidence offered by the plaintiff for the purpose of showing that the iron ore and other metals, minerals, and clays on the lot of land in question were of no value, was the testimony of John Knox. He testified to the thickness of the iron ore at certain openings on the lot; and with respect to the value of the ore he testified as follows: "It could be worked to some extent on the south hill side, although the hill climbs up pretty rapidly, . . and would be very expensive. That's about all they would have, would be a stripping proposition; it is so narrow it could not be mined by tunnels, etc., under ordinary conditions, Ditt Watts

showed me the openings that have been made up there. Whether that lot of land would be a profitable proposition would depend on circumstances. There could be some stripping done on the south hill. I would say that ore could be stripped back until they get off about a ten-foot cover of slate over it, and I don't know the area that would be covered by that, don't know just where the line runs. The ore runs or dips slightly to the south. It apparently, where I saw it, runs almost level, east and west, and dipping slightly to the south. If that hill is in the southwest corner of the lot, the ore would soon run off of the lot, on to other property. . . Nobody can tell how much ore there is under there until they actually go in there and mine it."

There was iron ore on the land. This fact was undisputed. This ore had some value. According to the recitals in the plaintiff's deed to H. P. Lumpkin, he received $300 in money for the mineral interest in the land, more than a quarter of a century before the execution of the bond to the defendant. We are forced to the conclusion that the evidence demanded a finding that the land, by reason of the previous conveyance of the mineral interest and rights therein, was less valuable than it would have been if such interest and rights had not been sold. For reasons that are obvious, the land was rendered less valuable by the grant of the permanent easement to the telephone company. Under the bond for title as it stood, the defendant, or his assigns, was entitled to an absolute or fee-simple estate in the land. "An absolute or fee-simple estate is one in which the owner is entitled to the entire property, with unconditional power of disposition during his life, and descending to his heirs and legal representatives upon his death intestate." Civil Code, § 3657. Under our code, real estate "includes all lands and the buildings thereon, and all things permanently attached to either, or any interest therein or issuing out of or dependent thereon. The right of the owner of lands extends downward and upward indefinitely." Civil Code, § 3617. A conveyance of the absolute or fee-simple estate in a tract of land would of course carry with it all mines, minerals, and clays in and under the same. An absolute estate in land carries with it the exclusive and unrestricted right to occupy, use, and dispose of the same. The right to possess, use, and to exclude every one else from interfering with a tract of land is not only a right, in all

circumstances affecting the value of the land, but it is of the essence of ownership itself. It is precisely the right of exclusive occupancy and use which the plaintiff can not convey to the defendant. The value of the right is not merely nominal, and can not, under the circumstances of this case, be so considered.

We have not dealt with other assignments of error made in the bill of exceptions; and we are not to be understood as holding that the jury might not have been authorized to return a verdict for the plaintiff for the balance of the purchase-money, upon other issues in the case. None of the other issues were passed upon by the jury. We have, however, examined the record for the purpose of ascertaining whether a judgment or decree for the plaintiff was demanded by the evidence on any of such issues; and while we do not pass upon the questions of the sufficiency of the evidence to authorize a finding for the plaintiff upon any of such issues, we are of the opinion that the evidence on none of the other issues demanded a verdict or judgment for the plaintiff. Since, therefore, the answers to the only questions passed upon by the jury are contrary to the evidence and without evidence to support them, the court erred in overruling the motion for new trial.

*Judgment reversed. All the Justices concur.*